**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS DIVISION**

**JAMES DOUGLAS MOORE,**

      **Plaintiff,**

**v.**                                         **Civil Action No. 2:12-cv-29**
                                                  **JUDGE BAILEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT THE DISTRICT**
**COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [15],**
**GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[17],**
**AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.   INTRODUCTION

On April 16, 2012, Plaintiff James Douglas Moore ("Plaintiff"), proceeding *pro se*,[1] filed a

Complaint in this Court to obtain judicial review of the final decision of Defendant Michael J.

Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1.)  On

July 18, 2012, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States

Attorney, filed an answer and the administrative record of the proceedings.  (Answer, ECF No. 6;

Administrative Record, ECF No. 7.)  On August 16, 2012, and September 17, 2012, Plaintiff and

the Commissioner filed their respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J.

("Pl.'s Mot."), ECF No. 15; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 17.)  On September

20, Plaintiff filed a Reply in Further Support of Plaintiff's Motion for Summary Judgment.  (Reply,

---

[1] At the time he filed his Complaint, Plaintiff was proceeding *pro se*.  However, Plaintiff
is now represented by Travis M. Miller, Esquire, and Eddy Pierre Pierre, Esquire.

ECF No. 19.)  Following review of the motions by the parties and the administrative record, the

undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  BACKGROUND

### A.  *Procedural History*

On May 19, 2008, Plaintiff protectively filed a Title II claim for disability insurance benefits

("DIB"), alleging disability that began on June 19, 2007.[2]  (R. at 78, 130-33.)  His claim was initially

denied on September 3, 2008 and again upon reconsideration on January 20, 2009.  (R. at 82-86, 89-

91.)  Plaintiff filed a request for a hearing, which was held before United States Administrative Law

Judge ("ALJ") George A. Mills, III on May 11, 2010 in Morgantown, West Virginia.  (R. at 30, 99-

103.)  Plaintiff, represented by Danielle Webb, Esquire, appeared and testified, as did James Ganoe,

an impartial vocational expert.  (R. at 30.)  On June 8, 2010, the ALJ issued an unfavorable decision

to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act ("Act").

(R. at 18-27.)  On February 16, 2012, the Appeals Council denied Plaintiff's request for review,

making the ALJ's decision the final decision of the Commissioner.  (R. at 1.)  Plaintiff now requests

judicial review of the ALJ's decision finding him not disabled.

### B.  *Personal History*

Plaintiff was born on June 7, 1965 and was 42 when he filed his DIB application.  (R. at

130.)  He completed high school in 1985 and has prior work experience as an implementation

director in a mental health agency.  (R. at 155, 158, 177-78.)  Plaintiff has never been married and

---

[2] At the hearing, the ALJ noted that Plaintiff had first filed an application for DIB in March of 2005, and that ALJ Randall Moon issued an unfavorable decision on June 18, 2007. (R. at 33.)  Plaintiff appealed that decision to the Appeals Council, the Appeals Council affirmed the ALJ's decision, and Plaintiff took no further action on that application.  (*Id.*)

has no dependent children.  (R. at 130-31.)

*C.*     *Relevant Medical History*

### 1.     Relevant Medical History Pre-Dating Alleged Onset Date of June 19, 2007

Plaintiff saw Dr. Colvin of Psychiatric Associates on June 14, 2007.  (R. at 218.)  Plaintiff reported that he was overall doing better and was experiencing less panic attacks.  (*Id.*)  He reported that he was improved because of a good mood, fewer and less intense panic attacks, and the fact that he was leaving his house more.  (*Id.*)  Dr. Colvin continued Plaintiff's medications and noted that he had good emotional expression.  (*Id.*)

### 2.     Relevant Medical History Post-Dating Alleged Onset Date of June 19, 2007

On September 13, 2007, Plaintiff told Dr. Colvin that he was not doing so well and had experienced an increase in panic attacks.  (R. at 217.)  He also noted increased difficulty in leaving his house, but also admitted to not practicing relaxation.  (*Id.*)  Dr. Colvin noted that Plaintiff was anxious and had fair emotional expression.  (*Id.*)  He continued Plaintiff's medications and advised him to practice deep breathing daily.  (*Id.*)  At Plaintiff's next appointment on October 11, 2007, he reported that he had been feeling a little better and that he had been practicing relaxation more.  (R. at 216.)  Plaintiff also noted that he had noticed a cycle in his panic attacks and was keeping track of them on a calendar.  (*Id.*)  Dr. Colvin noted that Plaintiff appeared less anxious and had good emotional expression.  (*Id.*)  He continued Plaintiff's medications.  (*Id.*)  At Plaintiff's last appointment in 2007, he reported that he was "doing pretty good", especially with being around people.  (R. at 215.)  Dr. Colvin noted that Plaintiff appeared less anxious and had good emotional expression.  (*Id.*)  He continued Plaintiff's medications.  (*Id.*)

Plaintiff's was seen by Dr. Colvin on March 11, 2008.  (R. at 214.)  He reported that his

panic attacks had been a little worse for about a month and a half, but that these were not as intense as ones before. (*Id.*) Dr. Colvin noted that Plaintiff appeared anxious and had good emotional expression, and he continued Plaintiff's medications. (*Id.*) At Plaintiff's next appointment on June 10, 2008, Plaintiff reported that he was having some good days but was still having some bad days. (R. at 213.) He also complained that he was having more intense panic attacks despite getting them less often, and that these attacks went away whenever he returned to his house. (*Id.*) Dr. Colvin noted that he appeared anxious and had fair emotional expression, and he decreased Plaintiff's one medication. (*Id.*) On July 8, 2009, Plaintiff reported feeling better but also more nervous since taking both Lexapro and another medication; he noted that he had only had two panic attacks since switching to Lexapro but was more anxious and was not leaving his house often. (R. at 212.) Dr. Colvin stated that Plaintiff appeared anxious and had good emotional expression, and he continued his medication. (*Id.*)

On July 8, 2008, Dr. Colvin completed a psychiatric/psychological impairment questionnaire for Plaintiff. (R. at 223-31.) He noted that Plaintiff suffered from panic disorder with agoraphobia and depressive disorder not otherwise specified. (R. at 224.) Dr. Colvin noted that Plaintiff's current Global Assessment of Functioning ("GAF") score was 45 and that his lowest GAF within the past year was 41. (*Id.*) Dr. Colvin's prognosis that Plaintiff would be able to regain normal functioning was poor. (*Id.*) He noted that Plaintiff's primary symptoms were frequent panic attacks and an inability to leave home because of agoraphobia. (R. at 226.)

In this questionnaire, Dr. Colvin determined Plaintiff was mildly limited in his ability to make simple work-related decisions, his ability to ask simple questions or ask for assistance, his ability to accept instructions and respond to criticism, and his ability to set realistic goals or make

independent plans. (R. at 228-29.) He found Plaintiff was moderately limited in his ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to sustain an ordinary routine, ability to maintain socially appropriate behavior, and his ability to respond appropriately to work-setting changes. (R. at 227-28.) Finally, Dr. Colvin determined Plaintiff was markedly limited in his ability to perform activities within a schedule and maintain regular attendance, ability to work in coordination with others, ability to complete a normal workweek without interruptions, ability to appropriately interact with the public, ability to get along with co-workers or peers, and ability to travel to unfamiliar places or use public transportation. (R. at 227-29.) He also noted Plaintiff experienced episodes of deterioration or decompensation because of his difficulty tolerating being around other people. (R. at 229.)

Dr. Colvin stated Plaintiff's impairments would last at least twelve months, and that he was incapable of tolerating even "low stress" because of his marked anxiety with even a small group of people. (R. at 230.) He determined Plaintiff was likely to be absent from work more than three times a month and his description of Plaintiff's symptoms and limitations applied as far back as 1998. (R. at 231.) Overall, Dr. Colvin opined while Plaintiff has had some response to his medication, he has had "no complete resolution of his symptoms and his functioning has never returned to the point he could resume work." (R. at 223.) Overall, Dr. Colvin believed Plaintiff would not be able to "maintain work in the competitive work environment". (*Id.*)

Plaintiff saw Dr. Colvin again on August 18, 2008. (R. at 264.) He reported that his energy was better that he was experiencing more anxiety on his Lexapro prescription. (*Id.*) Dr. Colvin noted Plaintiff was experiencing two panic attacks per week but that they were not as intense. (*Id.*)

Plaintiff appeared anxious with good emotional expression, and Dr. Colvin's assessment was "about the same". (*Id.*) He increased Plaintiff's Lexapro prescription. (*Id.*)

On August 26, 2008, Dr. Fulvio Franyutti completed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. at 232-39.) He determined Plaintiff could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand, walk, and sit for six hours in an eight-hour work day; and was unlimited in pushing and pulling. (R. at 233.) Dr. Franyutti noted Plaintiff could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (R. at 234.) Plaintiff needed to avoid concentrated exposure to extreme cold and heat, hazards, and fumes, odors, gases, dusts, and poor ventilation. (R. at 236.) Dr. Franyutti noted Plaintiff was partially credible. (R. at 237.) He agreed with the ALJ decision from 2007 which noted Plaintiff was "able to perform all levels of exertional work with environmental limitations including avoiding high concentrations of dusts, fumes, or gases and exposure to heights and hazards; no climbing of ladders, ropes, or scaffolds." (R. at 238.) Dr. Franyutti later corrected this to state that he disagreed with the 2007 decision and he believed Plaintiff "could perform light work with limitations of fumes, gases, height, hazards." (R. at 240.) Dr. Porfirio Pascasio affirmed this assessment on January 20, 2009. (R. at 289.)

Dr. Philip Comer completed a Psychiatric Review Technique of Plaintiff on September 2, 2008. (R. at 241-54.) He noted Plaintiff had a depressive syndrome characterized by psychomotor agitation, decreased energy, and feelings of guilt or worthlessness. (R. at 244.) Dr. Comer also found Plaintiff suffered from an anxiety disorder because of persistent irrational fears and recurrent severe panic attacks. (R. at 246.) He determined Plaintiff was moderately limited in his activities of daily living, his ability to maintain social functioning, and his ability to maintain concentration,

persistence, or pace. (R. at 251.) However, he noted Plaintiff did not experience extended-duration episodes of decompensation. (*Id.*)

Dr. Comer also completed a Mental Residual Functional Capacity Assessment of Plaintiff. (R. at 255-58.) He noted Plaintiff was moderately limited in his ability to maintain concentration and attention for extended periods, his ability to perform activities with a schedule and maintain regular attendance, and his ability to work in coordination with others without being distracted by them. (R. at 255.) He also found that Plaintiff was moderately limited in his ability to complete a normal workweek and workday without interruptions, his ability to interaction appropriately with the public, his ability to accept instructions and respond appropriately to criticism, his ability to get along with coworkers or peers, and his ability to travel in unfamiliar places or use public transportation. (R. at 256.) Dr. Comer determined Plaintiff's deficits did not meet or equal a listing, and he agreed with the 2007 ALJ decision. (R. at 257.) He noted that Plaintiff "appears to be able to follow routine low stress work not requiring high production standards and not requiring frequent interaction with the public". (*Id.*)

Plaintiff saw Dr. Colvin again on October 9, 2008. (R. at 261.) Plaintiff complained he had four panic attacks, but that these were not as intense as ones he had experienced before. (*Id.*) He also reported that he was not leaving the house much. (*Id.*) Dr. Colvin noted Plaintiff had fair emotional expression, increased his Lexapro prescription, and scheduled another appointment for six weeks later. (*Id.*)

Dr. Comer completed another Mental Residual Functional Capacity Assessment on January 12, 2009. (R. at 271-74.) He found the same moderate limitations as he did before, with the addition that Plaintiff was moderately limited in his ability to respond appropriately to changes in

the work setting. (R. at 272.) Dr. Comer determined Plaintiff's functional limitations did not allow for an RFC allowance and he appeared to have the "mental/emotional capacity for work related activity in a low stress/demand work environment that has minimal social interaction/travel requirements and that can accommodate his physical limitations". (R. at 273.)

Dr. Comer also completed another Psychiatric Review Technique. (R. at 275-88.) He noted Plaintiff suffered from a depressive disorder not otherwise specified. (R. at 278.) He also found Plaintiff suffered from an anxiety disorder with recurrent severe panic attacks and agoraphobia. (R. at 280.) At this time, Dr. Comer determined Plaintiff was mildly limited in his activities of daily living but was moderately limited in his abilities to maintain social functioning and concentration, persistence, or pace. (R. at 285.) He also noted that Plaintiff experienced once or two extended-duration episodes of decompensation. (*Id.*) Overall, Dr. Comer found Plaintiff's statements were "reasonably consistent with other evidence in file and are credible from his perspective". (R. at 287.)

Plaintiff began to see Dr. Attia on February 2, 2009 because Dr. Colvin was retiring. (R. at 291.) Plaintiff told Dr. Attia his main concerns were panic attacks and anxiety and that he spent most of his time at home doing housework, watching television, or playing on the computer. (*Id.*) He complained that his attacks were spontaneous and that he was worried and nervous between attacks. (*Id.*) During the initial evaluation, Dr. Attia noted Plaintiff had an anxious affect and was cooperative. (R. at 292.) He displayed fair insight into his condition and fair judgment. (*Id.*) Dr. Attia diagnosed panic disorder with agoraphobia, generalized anxiety disorder, and moderate stressor related to financial difficulty. (R. at 293.) He assessed a GAF score of 65. (*Id.*) Dr. Attia started Plaintiff on Celexa and Klonopin prescriptions and noted that he might benefit from therapy.

(*Id.*)  A month later, Plaintiff reported the medications were helpful and he had noticed a decrease in the frequency and intensity of his panic attacks.  (R. at 294.)  Dr. Attia increased his Celexa prescription and continued Klonopin.  (*Id.*)

Dr. Attia saw Plaintiff again on March 30, 2009.  (R. at 295.)  Plaintiff reported his medications had been helping but that he still had some residual symptoms of anxiety.  (*Id.*)  Dr. Attia noted Plaintiff was responding fairly to treatment, added a Clonidine prescription, and continued Plaintiff's other medications.  (*Id.*)  A month later, Dr. Attia noted Plaintiff had an anxious affect and was concerned about panic attacks and his fear of going out.  (R. at 296.)  He assessed partial response to treatment, increased Plaintiff's Klonopin prescription, and continued his other medications.  (*Id.*)

Plaintiff did not see Dr. Attia again until July 7, 2009.  (R. at 297.)  He reported feeling tired from his medications and that he was having recurring panic attacks.  (*Id.*)  Plaintiff also noted he had a history of responding better to Ativan than Klonopin.  (*Id.*)  Dr. Attia stated Plaintiff was showing a partial response to treatment, discontinued Plaintiff's Klonopin and Clonidine, began Ativan and Lamictal prescriptions, and continued his Celexa.  (*Id.*)  Approximately two months later, Plaintiff told Dr. Attia his medications were of some help but that he was not noticing much of a change with the addition of Lamictal.  (R. at 298.)  Dr. Attia encouraged him to continue his efforts to overcome his fears, assessed partial response to treatment, and continued his medications. (*Id.*)

Plaintiff saw Dr. Attia again on December 8, 2009.  (R. at 300.)  Plaintiff had a neutral affect and reported he had been taking his medications until he ran out.  (*Id.*)  He noted he had observed a decrease in his anxiety symptoms but that he still had difficulty with being in public places.  (*Id.*)

Plaintiff reported his medications were helpful. (*Id.*) Dr. Attia assessed partial response to treatment, increased Plaintiff's Lamictal prescription, and continued his other medications. (*Id.*)

Dr. Robert Klein completed a psychological evaluation of Plaintiff on June 7 and 9, 2010. (R. at 303-12.) At this evaluation, Plaintiff reported his first panic attacks occurred during his marriage and that he almost always has felt discouraged and depressed. (R. at 304.) He also reported almost always feeling shy, inferior, easily hurt by criticism, and more comfortable when alone. (*Id.*) Dr. Klein noted Plaintiff was cooperative with a positive attitude, normal social interaction, full orientation, restricted affect, and agitated depressed mood. (*Id.*) He diagnosed Plaintiff with panic disorder with agoraphobia; major depressive disorder, recurrent, severe without psychosis; generalized anxiety disorder; disorder of written expression; avoidant personality disorder; and psychosocial stressor–health and economic problems. (R. at 310.) Dr. Klein assessed Plaintiff with a GAF score of 45. (*Id.*) He noted Plaintiff had been in a "severely emotionally volatile state" for at least ten years and that he should be receiving weekly psychotherapy and more frequent psychiatric treatment. (R. at 312.) Dr. Klein opined Plaintiff's prognosis was very poor and that he was incapable of any form of employment because of his mental state. (*Id.*) Finally, he noted Plaintiff's GAF "may have been at a 50 in the past year and never at a 65 [and] [i]t has decreased to 45 at best." (*Id.*)

Dr. Klein also completed a psychiatric/psychological impairment questionnaire on June 10, 2010. (R. at 313-20.) He noted Plaintiff's symptoms and functional limitations were reasonably consistent with his physical and/or emotional impairments described in the evaluation. (R. at 315.) Dr. Klein determined Plaintiff was mildly limited in his ability to remember locations and work-like procedures, his ability to carry out simple instructions, and his ability to be aware of normal hazards

and take appropriate precautions. (R. at 316, 318.) He also found that Plaintiff was moderately limited in his ability to understand and remember one or two step instructions, his ability to carry out detailed instructions, his ability to make simple work-related decisions, his ability to ask simple questions or ask for assistance, his ability to maintain socially appropriate behavior, and his ability to set realistic goals or make independent plans. (*Id.*)

Finally, Dr. Klein noted Plaintiff was markedly limited in his ability to understand and remember detailed instructions, his ability to maintain attention for extended periods, his ability to perform activities within a schedule and maintain regular attendance, his ability to sustain an ordinary routine without supervision, his ability to work with others without being distracted, his ability to complete a normal workweek without interruptions, his ability to appropriately interact with the public, his ability to accept instructions and respond appropriately to criticism, his ability to get along with co-workers or peers, his ability to respond appropriately to work setting changes, and his ability to travel to unfamiliar places or use public transportation. (*Id.*) He expected Plaintiff's impairments to last at least twelve months and noted that Plaintiff was incapable of even "low stress". (R. at 319.) Dr. Klein also estimated Plaintiff would be absent from work more than three times per month and that his symptoms and limitations had been in duration for at least six years. (R. at 320.)

Plaintiff had another appointment with Dr. Attia on September 24, 2010. (R. at 323.) Dr. Attia noted Plaintiff had a neutral affect. (*Id.*) Plaintiff reported his medication had been somewhat helpful and he was seeing some improvement in managing his anxiety symptoms. (*Id.*) Dr. Attia encouraged Plaintiff to "continue his effort in improving his financial state considering his emotional restrictions". (*Id.*) Dr. Attia assessed partial response to Plaintiff's treatment, increased his Ativan

prescription, continued his Celexa, and added a prescription for Trazodone for managing sleep. (*Id.*)

The record reflects a visit to Dr. Attia on February 14, 2011. (R. at 324.) Dr. Attia noted Plaintiff had a neutral affect and was agreeable to all recommendations. (*Id.*) Plaintiff reported his medication had been helpful and that he had been taking it as prescribed. (*Id.*) He stated he had some improvement in his mood and had seen a decrease in the number and frequency of his panic attacks. (*Id.*) Dr. Attia encouraged Plaintiff to continue treatment and his effort to do outdoor activities. (*Id.*) He assessed Plaintiff was responding fairly to his treatment, continued his current medications, and reduced Plaintiff's visits to once every six months. (*Id.*)

### D.    *Testimonial Evidence*

At the hearing before the ALJ, Plaintiff testified he has a driver's license, but he does not drive if he is having a bad day or is experiencing stress. (R. at 39.) He left work at the Association for Retarded Citizens ("ARC") in 2004, and since then, he has applied for jobs, but has not obtained any positions. (R. at 40.) Plaintiff does not receive welfare or any other benefits. (R. at 40-41.) He lives off of money he saved when working and an inheritance received from his parents. (R. at 41.)

Plaintiff worked for the ARC for approximately nineteen years, but left when his panic attacks became such that he could not hide them anymore. (*Id.*) As an implementation director, he was responsible for schedules and ensuring that employees had the training and certificates they required. (R. at 41-42.) Plaintiff was also responsible for hiring and firing staff. (R. at 43.) In a typical day, Plaintiff mostly did scheduling and ensured that people were where they were supposed to be. (*Id.*) Most of the time, he worked at a desk, and the heaviest item he lifted was a box of copy paper. (R. at 44.)

At the hearing, Plaintiff testified his worst problem was panic attacks. (R. at 45.) He noted he also experienced a type of anemia that makes him tired, but he takes no medication for it and has worked with it. (R. at 46.) He sees Dr. Ortea for panic attacks anywhere from once a month to once every three months. (R. at 46-47.) Plaintiff has not been hospitalized for his mental problems, nor does he see a counselor. (R. at 47.) He takes Ativan and Lexapro and does not experience any side effects from these medications. (*Id.*) Plaintiff noted he cannot remember as well as he used to be able to, but he reported he was not sure if that was from his medications. (R. at 48.)

Plaintiff testified he watches television and occasionally uses a computer. (*Id.*) He has trouble being around people. (R. at 49.) Plaintiff noted sometimes he will have more than one panic attack per day, but at other times he will go as many as five days without one. (R. at 49-50.) A small attack will last for a couple of hours, but a large one forces him to take medication and go to sleep. (R. at 50.) Plaintiff stated his Ativan helps take the edge off his panic attacks and will keep them from happening a lot of the time. (R. at 51.)

Plaintiff noted he can take care of all of his personal hygiene requirements, and that the friend he lives with takes care of meals. (R. at 51.) He lives on a farm, and on a good day will "piddle around in the yard and around in the house". (R. at 51-52.) Plaintiff occasionally mows the yard with a push mower. (R. at 52.) He inherited the property from his parents, and he was required to take care of his parents before they passed away. (R. at 53.) Plaintiff took care of all the household chores for his mother. (R. at 54.) He testified that now, on a good day, he can vacuum, take out trash, do dishes, and do light maintenance around the house. (R. at 54-55.) He can do his own laundry, but hardly ever goes shopping. (R. at 56.) When things are not going well, he will sit in a room by himself. (R. at 55.) Plaintiff testified bad days occur twice or three times per week

in a thirty-day period.  (R. at 55-56.)

At the hearing, Plaintiff testified the public bothers him more than anything else.  (R. at 56.)

He does not have many hobbies or activities, but he will try to grow vegetables for a friend to sell

at the farmer's market.  (R. at 56-57.)  Plaintiff noted that he used to enjoy going to the movies and

shopping, but that he rarely does those things anymore.  (R. at 58.)  He goes shopping at Southern

States to get seeds and garden supplies, but testified that he usually goes when the store is about to

close and will "get in and get out".  (*Id.*)  He does not belong to any organizations.  (*Id.*)

### E.      *Vocational Evidence*

Also testifying at the hearing before the ALJ was James Ganoe, an impartial vocational

expert.  Mr. Ganoe classified Plaintiff's previous work as an implementation director at a mental

health agency as sedentary, skilled work.  (R. at 60.)   The ALJ then posed the following

hypotheticals to Mr. Ganoe:

> Q:      Profile would be based upon his testimony, 42 as of the date he alleged his
> onset, '07, and he's 44 now.  He's still a younger individual with the past
> work that you described.  Hypothetically, if an individual is, you know, by
> the way, has a high school education.  If a hypothetical individual were
> limited to the light exertional level of work, light work is lifting twenty
> pounds occasionally and ten pounds frequently.  The ability to stand walk is
> six hours in an eight-hour day, sitting six hours in an eight-hour day with
> normal breaks.   Consider also no climbing of any ladders, ropes or
> scaffolding and only occasionally climb a ramp or a step or so any balancing,
> stooping, kneeling, crouching and crawling.  Now, on the environmental
> considerations, we need to avoid temperature extremes of heat and cold,
> fumes, dust, odors, gasses, pollutants, and hazards.  The hazards are moving
> plant machinery or any unprotected heights.  Now, if an individual, as I've
> described, is limited to light work with the additional non-exertional
> considerations in the hypothetical, would an individual so limited be able to
> do the work that Mr. Moore did in the past?
>
> A:      Yes, they would, Your Honor.
>
> Q:      Now, let's assume the additional limitations of unskilled work with

occasional contact with a supervisor or co-worker, but no public contact and no rapid production quotas. Using your training and knowledge of the regulations, if I added that hypothetical to the previous hypothetical and ask you if an individual with a combined impairments as I've described with the limitations and restrictions, would the past work that Mr. Moore did be available with those additional non-exertionals?

A:      No, it would not be available, Your Honor.

Q:      Would there be any job or jobs that you could identify in the national or regional economy that would accommodate a hypothetical combination in the numbers, of course, and in the region, and the definition of the region to be provided by you?

A:      The region I'll be using is all of West Virginia, western Maryland, western Pennsylvania, and eastern Ohio. Under the light exertional level, a mail clerk working in private business, 202,000 nationally; 2,300 regionally. Also a price marker, 319,000 nationally; 1,675 regionally. Those are samplings, Your Honor.

Q:      Well, let's assume that the testimony of Mr. Moore is considered credible, and by credible, I mean good and by good I mean, the medical evidence supports his testimony. And, as a result of the medical evidence and the documentation that he has provided, he not only would not be able to do the sedentary skilled work that he did in the past, but he would not be able to do even any of the light work with the additional considerations that I posed to you in the hypotheticals. He would not be able to do even unskilled work. The residuals of his condition primarily anxiety and panic attack would rise to the level of marked as a result of affecting the ability to maintain attention, concentration and pace to compete [sic] a full eight-hour workday, five days a week for forty hours. And, because of his condition, there's a frequency of which he said was, perhaps once or twice a week of different durations, it would be necessary to miss work. The absences would definitely be more than two times in a 30-day period, and perhaps as many as four or five or more in that same 30-day period. If that would be the case, Mr. Ganoe, would there be any job he could perform?

A:      No, Your Honor. There would not be any jobs available.

Q:      Okay. And is your testimony consistent with the *Dictionary of Occupational Titles*?

A:      Yes, it is, Your Honor.

(R. at 60-63.)

A Report of Contact form dated September 2, 2008 noted Plaintiff could not perform his past work as a director at a mental health agency. (R. at 183.) However, Plaintiff could perform work as a pillow cleaner, wire cutter, and putty mixer and applier. (*Id.*) It was noted that Plaintiff's "mental RFC limits him to routine low stress work in a setting with low social interaction demands and which does not require high production rates". (*Id.*)

**F.      *Lifestyle Evidence***

In an Adult Function Report dated August 4, 2008, Plaintiff reported that on days that he does not experience panic attacks, he can do things around the house but stays close to the house, and on days when he has panic attacks he stays in the bedroom. (R. at 169.) He stated his conditions cause him no problems with personal care. (R. at 170.) Plaintiff prepares his own meals daily makes sandwiches most of the time. (R. at 171.) He does not do much house or yard work but will do laundry on good days. (R. at 171-72.)

Plaintiff reported he goes outside once or twice a week when he is having a good week. (R. at 172.) Plaintiff can drive and ride in a car, but he does not usually go out alone. (*Id.*) Plaintiff shops by computer and has a friend that does most of the shopping for him. (*Id.*) He can pay bills, count change, handle a savings account, and use a checkbook and money orders. (*Id.*) Plaintiff did not report any hobbies or interests. (R. at 173.) He does not spend time with others, but he tries to go to a store once a week per his doctor's orders. (*Id.*) Plaintiff reiterated this information in another Adult Function Report dated November 11, 2008. (R. at 187-94.)

### III.      CONTENTIONS OF THE PARTIES

Plaintiff, in his motion for summary judgment, asserts the following assignments of error:

- The ALJ failed to follow the treating physician rule;

- The ALJ failed to properly evaluate his credibility; and

- The Appeals Council failed to properly consider new evidence.

(Mem. of Law Supp. Pl.'s Mot. for Summ. J. ("Pl.'s Br."), ECF No. 16 at 9-15.) Plaintiff asks that the Court reverse the Commissioner's decision and remand the case for the calculation of benefits or, in the alternative, reverse the decision and remand the case for a new hearing and decision. (*Id.* at 16.)

The Commissioner, in his motion for summary judgment, asserts the ALJ's decision is "supported by substantial evidence and should be affirmed as a matter of law". (Def's Mot.) Specifically, Defendant asserts:

- The ALJ properly evaluated the opinions of Drs. Colvin, Roman, and Comer;

- Substantial evidence supports the ALJ's credibility determination; and

- The evidence submitted to the Appeals Council did not provide a basis to change the ALJ's decision.

(Def.'s Br. Supp. Mot. For Summ. J. ("Def.'s Br."), ECF No. 18 at 7-15.)

Plaintiff, in his Reply, argues:

- Defendant fails to address the difference between a medical opinion and legal opinion;

- Plaintiff responded to treatment or was stable with treatment, but he could not resume working at a job on a sustained basis; and

- The ALJ is obligated to evaluate Dr. Colvin's medical opinions under each of the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6).

(Reply at 1-2).

## IV.    STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence.  *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations."  *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976).  Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.    ANALYSIS

***A.***     ***Standard for Disability and the Five-Step Evaluation Process***

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520, 416.920 (2011).]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (2011). If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. *Id.*

**B.     *Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the following findings:

1.     **The claimant meets the insured status requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act so as to be insured for such benefits since June 19, 2007.**

2.     **The claimant has not engaged in substantial gainful activity since June 19, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*).**

3.     **Since June 19, 2007, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited his ability to perform basic work activity for a period of at least 12 consecutive months: history of hemolytic anemia; depressive disorder; and anxiety disorder/panic disorder with agoraphobia (20 CFR 404.1520(c)).**

4.     **Since June 19, 2007, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

5.     **Since June 19, 2007, the claimant has had the residual functional capacity to perform a range of unskilled work activity that: requires no more than a "light" level of physical exertion; requires no climbing of ladders, ropes or scaffolds, or more than occasional performance of other postural movements (i.e. balancing, climbing ramps/stairs, crawling, crouching, kneeling and stooping); requires no exposure to temperature extremes of heat or cold, respiratory irritants (e.g. fumes, odors, dust, gases, or pollutants) or hazards (e.g. dangerous moving machinery, unprotected heights); requires no rapid production quotas; and requires no more than occasional contact with supervisors and coworkers and no contact with the general public (20 CFR 404.1567(b)).**

6.     **The claimant is unable to perform any past relevant work (20 CFR 404.1565).**

7.    The claimant is appropriately considered for decisional purposes as a "younger individual" (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, at any time from June 19, 2007, through the date of this decision (20 CFR 404.1520(g)).

(R. at 20-27.)

C.    *Analysis of the Administrative Law Judge's Decision*

1.    **The ALJ Properly Followed the Treating Physician Rule**

As his first assignment of error, Plaintiff asserts the ALJ failed to follow the treating physician rule. (Pl.'s Br. at 9-12.) Specifically, Plaintiff argues the ALJ "failed to give good reasons for rejecting the opinions from the treating psychiatrist Dr. Colvin and instead adopting the non-examining source opinions". (*Id.* at 10.) Furthermore, Plaintiff asserts even if the ALJ was not required to give Dr. Colvin's opinions controlling weight, he "still failed to weigh the treating doctor's opinions under the factors in 20 C.F.R. § 404.1527(c)(2)-(6)". (*Id.* at 12.) However, the undersigned finds that Plaintiff's argument is without merit.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not

inconsistent with other substantial evidence in the case record.  20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2); *see also Hines v. Barnhart*, 453 F.3d 559, 563 n.2 (4th Cir. 2006) (quoting *Hunter*

*v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)) ("The treating physician rule is not

absolute.  An 'ALJ may choose to give less weight to the testimony of a treating physician if there

is persuasive contrary evidence.'"); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).  However,

"treating source opinions on issues that are reserved to the Commissioner are never entitled to

controlling weight or special significance."  SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996).  For

example, the Commissioner is responsible for determining whether a claimant is disabled or unable

to work.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  Therefore, a medical source that offers an

opinion on whether an individual is disabled or unable to work "can never be entitled to controlling

weight or given special significance."  SSR 96-5p, 1996 WL 374183, at *5.

When an ALJ does not give a treating source opinion controlling weight and determines the

claimant is not disabled, the determination or decision "must contain specific reasons for the weight

given to the treating source's medical opinion, supported by the evidence in the case record, and

must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator

gave to the treating source's medical opinion and the reasons for that weight".  SSR 96-2p, 1996 WL

374188, at *5 (July 2, 1996).  The following factors are used to determine the weight given to the

opinion: 1) length of the treatment relationship and the frequency of examination, 2) the nature and

extent of the treatment relationship, 3) the supportability of the opinion, 4) the consistency of the

opinion with the record, 5) the degree of specialization of the physician, and 6) any other factors

which may be relevant, including understanding of the disability programs and their evidentiary

requirements.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  When an ALJ does not give a treating

source opinion controlling weight and determines that the Claimant is not disabled:

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. **This explanation may be brief.**

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (emphasis added). However, the ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. *See Pinson v. McMahon*, No. 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each one).

As an initial matter, the portion of Dr. Colvin's opinion stating Plaintiff "would [not] be able to maintain work in a competitive work environment" (R. at 223) is not entitled to controlling weight. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *see also Morgan v. Barnhart*, 142 F. App'x, 716, 722 (4th Cir. 2005) (finding that physician's statement that claimant "can't work a total of an 8 hour day" is a legal conclusion with no evidentiary value). Because this portion of Dr. Colvin's opinion is not medical evidence, the ALJ properly declined to assign controlling weight to his opinion on this issue.

Furthermore, although Plaintiff argues the ALJ must outline his consideration of the factors in 20 C.F.R. § 404.1527(c)(2)-(6) when deciding what weight to give Dr. Colvin's opinions, the undersigned rejects that argument. Instead, the ALJ must provide "specific reasons" for the weight given. Social Security Ruling 96-2p (1996 WL 374188). This district has held that an ALJ's failure to walk through each of the factors was not a bar to compliance with the specificity requirements

of 404.1527(d). *Moore v. Astrue*, No. 2:11cv17, 2011 WL 5117165, at *9 (N.D. W.Va. Oct. 26, 2011). In that case, Chief Judge Bailey stated, "the ALJ has made sufficiently clear the weight she gave to [the treating physician's] opinion and the reasons for that weight". (*Id.*) Furthermore, the court's own research revealed courts follow the same logic when reviewing ALJ's who addressed the relevant factors in their analyses. *Stiltner v. Comm'r of Soc. Sec.*, 244 F. App'x 685, 690 (6th Cir. 2007). In *Stiltner*, a case heard by the Sixth Circuit Court of Appeals, the Court found where each of the relevant 404.1527(d) factors are addressed in an ALJ's decision, the review of the ALJ's decision focuses not on whether he or she walked through each factor, but whether the ALJ "summarily dismiss[ed] the [treating physican's] opinion" or "detailed at substantial length why he found it lacking compared with the other evidence". (*Id.*)

This court finds the ALJ gave specific reasons for assigning Dr. Colvin's opinions with little weight. The ALJ pointed out with specificity that Dr. Colvin's opinions are contradicted by other substantial evidence in the record. Particularly, the ALJ determined Dr. Colvin's opinion was contradicted by Plaintiff's own testimony regarding his daily activities, Dr. Colvin's previous records of Plaintiff's symptom management with medication, and the records of Plaintiff's other treating psychiatrist, Dr. Attia (R. at 25.) *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (permitting an ALJ to consider whether the medical opinion is "inconsistent with the other substantial evidence in your case record"); *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003)) (determining that an ALJ may weigh other factors brought to his or her attention that tend to support or contradict a treating physician's opinion).

State agency consultants are "highly qualified" and "experts in Social Security disability

evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).  In making his decision, the ALJ assigned greater weight to the noncontradictory evidence provided by two state agency psychologists, as well as Plaintiff's second treating psychiatrist, Dr. Attia.  The ALJ examined and analyzed the longitudinal evidence of the entire record, considering the opinions of several doctors and health care providers.  As the ALJ reviewed the record as a whole, he determined which opinions to give more weight and which to give less weight.

It is also noted that Plaintiff argues the ALJ "rejected" the opinions from Dr. Colvin (Pl's Br. At 10.)  However, the undersigned notes the ALJ did consider the opinion of Dr. Colvin, but after comparing it to the record as a whole, accorded it less weight than the opinions of the consensus of the state agency psychologists' opinions (R. at 25.)  For instance, while reviewing Dr. Colvin's opinion, the ALJ noted that Dr. Colvin's opinion that Plaintiff was incapable of maintaining work in competitive work environment was an administrative finding reserved to the Commissioner  (R. at 25.)  Clearly, the ALJ did not reject the entirety of Dr. Colvin's medical opinions as Plaintiff alleges.  Therefore, the undersigned finds the ALJ assigned proper weight to the opinions of Plaintiff's treating physician Dr. Colvin, and made sufficiently clear the reasons for that weight.

### 2.    The ALJ Properly Evaluated Plaintiff's Credibility

As his second assignment of error, Plaintiff asserts the ALJ failed to properly evaluate his credibility.  (Pl.'s Br. at 12-14.)  Specifically, Plaintiff argues that just because he did not require psychiatric hospitalization does not automatically mean that he is not disabled.  (*Id.* at 13.)  Furthermore, Plaintiff asserts his "ability to engage in activities, almost exclusively at his own home, has little relevance to his ability to obtain and maintain competitive employment in light

of his mental impairments". (*Id.*)  However, the undersigned finds that Plaintiff's argument is without merit.

The determination of whether a person is disabled by pain or other symptoms is a two-step process.  *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996).  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged.  *Craig*, 76 F.3d at 594; *see also Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006).  Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record.  *Craig*, 76 F.3d at 594; *Hines*, 453 F.3d at 565.  Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).  The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2.  Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight.  *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).

This Court has determined "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court."  *Ryan v. Astrue*, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W.Va. Feb. 8, 2011) (Stamp, J.).  If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong'".  *Sencindiver v. Astrue*, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. February 3, 2010) (Seibert, Mag.) (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

Plaintiff's argument regarding the ALJ's credibility determination must fail.  Plaintiff argues the ALJ "simply noted" Mr. Moore was not hospitalized for his mental illness symptoms during the "limited extent" he considered the record.  (Pl.'s Br. at 13.)  Contrary to Plaintiff's assertion, the ALJ's decision, as well as the record, illustrate the ALJ evaluated Plaintiff's symptoms in accordance with the two-part test in *Craig* and the SSR 96-7p factors.  Under *Craig*, the ALJ first found that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms".  (R. at 23.)  The ALJ, however, did not find Plaintiff's statements concerning the intensity, persistence and the limiting effects of these symptoms to be "credible to the extent they are inconsistent with [Plaintiff's] residual

functional capacity assessment".  (*Id.*)

In coming to his conclusion that Plaintiff's subjective complaints are not entirely credible, the ALJ cites a variety of medical evidence, including the fact the entirety of Plaintiff's medical records show no emergency room visits or hospitalizations, nor any counseling or therapy sessions during his entire, years-long treatment period with Dr. Colvin for anxiety (R. at 23-24.)  The ALJ also cites Plaintiff's reported activities regarding daily living, concentration, persistence, and pace do not appear to be consistent with the frequency and debilitating degree of the symptoms he alleged, as Plaintiff reported the ability to attend to his own personal care, prepare meals, do laundry, mow grass, maintain a garden, and grow enough produce to have a friend sell at a farmer's market, use a computer, and drive.  (R. at 24.)  The ALJ further noted that since his first hearing, although Plaintiff alleges worsening panic attacks, the objective medical evidence of the record for that time period as well as the fact that Plaintiff continues to maintain his 30 acre residence does not support that contention.  (*Id.*)  The ALJ also cited Dr. Attia's treatment records, in which he found Plaintiff to be "generally responding well with medication" and noted Plaintiff "reported that the medication helped his symptoms.  (*Id.*)  The ALJ noted the record's indication that Plaintiff still experiences anxiety and panic attacks, but the panic attacks are generally less frequent and less intense with current medication and relaxation techniques.  (*Id.*)  He noted Plaintiff's affect has been reported as less anxious and even neutral by Dr. Attia.  (*Id.*)  The ALJ specifically noted that this is supported by the record's absence of emergency room visits or inpatient hospitalizations for panic attacks or anxiety.  (*Id.*)  Although Plaintiff argues it was inappropriate for the ALJ to rely on the fact that Plaintiff did not require hospitalization, the undersigned finds the ALJ analyzed this fact and used it in the

totality of his credibility determination. Accordingly, the ALJ's decision to not fully credit Plaintiff's statements was consistent with the medical record.

### 3.  The Appeals Council Properly Considered New Evidence

As his last assignment of error, Plaintiff asserts the Appeals Council received new and material evidence in Plaintiff's case but failed to provide an explanation of its consideration of this evidence. (Pl.'s Br. at 14-15.) Plaintiff asserts that the Appeals Council's failure to provide an explanation requires the Court to remand his case since the Court is not permitted to weigh the new evidence. (*Id.*) However, the undersigned finds that Plaintiff's assertion is without merit.

The Appeals Council must consider evidence submitted with the request for review in deciding whether to grant review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." *Wilkins v. Sec'y, Dep't of Health and Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991) (citing *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)); *see also* 20 C.F.R. § 404.970 (2011). Evidence is new if it is not duplicative or cumulative. *Id.* Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. *Wilkins v. Sec'y, Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Here, the Appeals Council, in its denial of Plaintiff's request for review, stated that it had considered the additional evidence, including the evaluation by Dr. Klein, but noted that "this information does not provide a basis for changing the Administrative Law Judge's decision." (R. at 1-2.) This evidence must relate to "the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §§ 404.970(b); 416.1470(b). Here, the ALJ hearing

decision was issued June 8, 2010 (R. at 15.)  The psychological evaluation given by Dr. Klein took place on June 7, 2010 and June 9, 2010, partially encompassing a date before the ALJ hearing decision.  (R. at 303).  However, the evidence is not material and does not require a remand.

Plaintiff cites a case decided in this Court, *McCartney v. Astrue*, 5:07-CV-103, 2008 WL 4371666 (N.D.W.Va. Sept. 22, 2008), where it was determined the Appeals Council's receipt of new and material evidence, with no explanation of how heavily it considered this new evidence, required a remand.  (Pl.'s Br. at 14-15.)  In that case, the Court found that a meaningful review of the record was not possible without an understanding of the weight the Appeals Council attributed to the additional evidence that was submitted by the Plaintiff and accepted and incorporated into the record by the Appeals Council after the ALJ issued his decision. *McCartney*, at *3.  The ALJ found that the Plaintiff had no severe mental impairment. (*Id.*) After the ALJ's decision, additional medical evidence in opinion reports from two psychologists, who both diagnosed that Plaintiff with severe, recurrent major depressive disorder was submitted to the Appeals Council.  (*Id.*)  Judge Stamp found that the additional evidence incorporated by the Appeals Council, the diagnosis and opinion of two different psychologists, could potentially contradict the ALJ's conclusion that the plaintiff did not have a severe mental impairment.  (*Id.* at 4.)  The undersigned finds Plaintiff's case is not akin to the additional evidence in *McCartney* because the additional evidence, Dr. Klein's evaluation, is not material.

Plaintiff's brief and the *McCartney* opinion cite the *Wilkins* decision, which discusses the materiality requirement.  The Fourth Circuit Court of Appeals in *Wilkins* determined, in weighing the materiality of additional evidence in the form of a letter, that "no other evidence

specifically addressed the issue" and that the evidence "might reasonably have changed the ALJ's conclusion that [Plaintiff] was not disabled". *Wilkins,* 963 F.2d at 96.

This is not the case with Dr. Klein's evaluation. There are several other psychological evaluations of Plaintiff in the record, and the only new information Dr. Klein provides is a new diagnosis of an underlying Avoidant Personality Disorder. Additionally, Dr. Klein's evaluation was prepared in anticipation of litigation at the request of Plaintiff's counsel. (R. at 303.)

Dr. Klein was presumably provided a copy of Plaintiff's medical record, and he utilized the record's previous treatment notes and clinical assessments in his evaluation of Plaintiff. (R. at 310.) For instance, in the diagnostic rationale for Panic Disorder with Agoraphobia, Dr. Klein noted the somatic problems Plaintiff experienced, palpitations, trembling, feeling of choking, and several more. (*Id.*) Dr. Klein explained "these are well documented in previous treatment notes and the Clinical Assessments to this date". (*Id.*) Additionally, in Dr. Klein's diagnostic rationale for Generalized Anxiety Disorder, he noted "a review of his file, the Assessments and Clinical Interview...would validate this diagnosis". (R. at 311.) This evaluation builds upon the record, as shown by the multiple references to the treating notes and other medical records, and it does not specifically address an issue that no other evidence has. Therefore, the undersigned finds that the Appeals Council properly did not remand the case based on this additional evidence.

## VI.    RECOMMENDATION

For the reasons herein stated, the undersigned Magistrate Judge finds that the Commissioner's decision denying Plaintiff's applications for disability insurance benefits and supplemental security income is supported by substantial evidence. Accordingly, the

undersigned Magistrate Judge **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (ECF No. 15) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 17) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 10th day of October, 2012.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE